Our first case of the morning is International Association of Firefighters v. City of Bloomington, 415-0573 for the appellant, Mr. Boyles, and for the athlete, Mr. Powers. You may proceed. Good morning. In this case, it is almost as if there are two different Section 14 interest arbitration awards under review. The award, which is 19 pages long at pages 1-11, discusses the act, discusses the evidence, applies the statutory factors, and there's not terribly anything controversial in the first 11 pages of the award. The projection was based on estimates that the arbitrator acknowledged may or may not be accurate. And it is during these last seven pages, beginning on page 12, that the award unravels, the logic behind the award unravels. And the arbitrator's distraction is evident as of page 13 of the award, where he makes several statements. He finds that the pension shortfall must be met. He finds that the pension shortfall goes to the crux of the dispute, and the dispute was about sick leave. And then he also says it raises the key question of how the city is going to meet its pension obligations. And the result is an award that is about pension funding and not about sick leave. Let me ask you a question. Was any evidence presented about what the actual or the actuarial impact would be on the shortfall based upon the firefighters that would be affected by this ruling? Or was it just the overall mention of and consideration of this huge pension shortfall? I don't recall any of the evidence that you suggest. The figure came from a certified audit financial report. Part of that report does list the city's various pension obligations, and it did contain the actuarial assumption. That's where the figure comes from. But I don't recall any evidence based upon new hires versus old hires. The evidence was that the assumption comes from the idea that if everybody, all of the fire, eligible fire employees retired at one point in time, like immediately, what would the obligation be? That's where the figure comes from. That was the only actuarial assumption that was thrown out there, and there wasn't a lot of time spent discussing it up here. So then nobody really knows what the effect would be of the sick leave policy today. It is rather some projection that would include all liabilities, including the pension liability, for the future if everybody left at the same time. Is that your understanding? There's no connection whatsoever between sick leave. But I think you alluded to the fact that it's a way to help fund or lessen. It does cost money. It costs money. So if you spend money, it's less money you have to spend elsewhere potentially. Potentially, but it's a completely separate fund. I understand that. I wasn't trying to confuse those two things. I'm trying to figure out what the arbitrator was thinking about. There is several mentions from pages 12 through 19 of the award that the arbitrators focused on this pension issue. Very generally, in a very broad sense, there are two ways to reduce this pension liability. You could either reduce the expenditures from the pension fund or increase revenue. And breaking that down, the way to reduce expenditures would be to, let's say, reduce the number of pensioners or reduce the pension benefits. But all of those things, either reducing the pension fund's expenditures or increasing its revenue, all of that was beyond the authority of the arbitrator. He couldn't do either one of those two things. And that wasn't the issue before him. The issue was sick leave purchase or retiree health insurance. The city isn't divisible, though. The city has its financial obligations. The argument seems to suggest that the arbitrator can't consider all of the financial obligations facing the city when it decides the specific issue in this case. Well, I don't mean to suggest that he can't consider it. And I think one of the statutory factors is the overall compensation package. One of the Section 14H factors is the overall compensation package for the firefighters. Isn't it also the financial ability of the unit of government to meet these costs? It is. Well, the city of Bloomington is confronted with costs. And they decided in this particular case to take the action they did because they thought it was going to reduce their costs. And the arbitrator thought that was not unreasonable. Why is that something which, given the deference we're supposed to give the arbitrators, that we should say he couldn't do? I don't think that's what the arbitrator did do. I don't think that's what he says. Through pages 12 through 19 of the board, he continually talks about how to reduce this pension deficit. I know the city argues that he did. At least the word that I read through pages 12 through 19, he doesn't say, Well, I'm just going to, you know, reduce the city's expenses generally. And then maybe in the future they could use that money to apply for this pension debt. Well, isn't all that just an explanation of when he talks into this about how big the burdens are in the city and why he thinks what the city proposed in this particular case with regard to the firefighters wasn't unreasonable? Well, he never said that. I mean, maybe that's what he was thinking, but that's not what his award says. Well, aren't we supposed to give deference to all this? And shouldn't we, by giving deference, if there's a reasonable way we can assume that the arbitrator was just considering this as a factor, that we should do so? That's the standard, but it's also the standard that in the Markham case, for example, if the arbitrator exceeded their authority, the award won't stand. I didn't hear what you just said. The arbitrator in the Markham case did what? If the interest arbitrator had exceeded their authority, then the award won't stand. And also there's the three prongs. Well, instead of the eight pages, what if he just said the city is facing a lot of serious obligations here and what the city tried to do in this case is a reasonable effort to try to meet its various obligations. Would that have been okay? Under those different facts, it would have been okay, but those aren't the facts of the case. Is it part of the record that the city has taken action that future hires, future firefighters, or I suppose other city employees would find themselves in a different situation so that it wouldn't be as great a financial burden in the future? Or is that a matter that's totally left to collective bargaining? Well, the theory under the award is that new hires hired after June of 2013 when they retire, if they have accumulated rather than used their sick leave, then at that point the city might save some money. But of course if they don't accumulate the sick leave, if they use it along the way, there's no savings. Right. But that is in place for the future? Yes, under this award. So is that part of your dispute? Are you focusing... explain that to me. Sure. Well, the dispute is that it's a faulty assumption, number one, to believe that that's going to save money. So we think that the logic under the last two Cicero prongs, the logic is faulty for lack of a better term. It's arbitrary and capricious. And it is part of, you know, we're seeking to undo the award which created this new second tier. So that's obviously what we're asking for. But it really doesn't... there's too much time in between now and when that's supposed to happen. There's too many different possibilities. It's too remote, too distant to believe that, you know, current city officials are going to remember this in 2033 or later and apply that money to this pension debt, by the way, which it's going to happen. This award doesn't save any money to divert to the pension debt now to keep this $37 million shortfall from occurring. It doesn't do anything. So it will be left to the discretion of city officials in the future to decide how to use any savings that occur. Yes. As opposed to being locked into or formalizing a policy or an agreement that it would help the pension fund. You're correct. Absolutely. Sort of like the state can have a lottery to fund education, but no dollars from the lottery ever went to education. That's correct. That's correct. Well, that's really an opinion, but I'm glad you agree with me. It's an opinion based upon experience. In addition to not guaranteeing any savings and accomplishing, you know, if it does accomplish any savings, it's going to be too late in the game anyway. It's not going to fix the problem that the arbitrator said he wanted to fix. There's some other faulty logic, some implausible explanations. The idea that the city, you know, is so strapped with its obligations that it must take steps now to prevent this future problem, but it could also afford to give away this $100,000 to the firefighters. And the arbitrator never addressed that, and the trial court below never addressed that. How can a person who has their hat in their hand asking for help give away what may not be a lot of money to the city of Bloomington, but is a lot of money, $100,000? I'm not sure I understand that argument. Is it that the city is unwise in making this offer, $1,000, to the respective firemen now, and therefore it undercuts its claim? If they're being honest, they're being unwise. Well, isn't the city's explanation, and I know actuary, so I don't know, but isn't their explanation saying in the long term, and I'm not even sure how long the term needs to be, we're better off financially to sweeten this deal, giving $1,000 right now to everybody, as opposed to continuing this sick leave policy which will cost us more? Isn't that what they're saying? And if they're saying that, how does that undercut, as you seem to be arguing, their proposal in the first place? Well, the idea is they need to save the money. The idea is they need to generate cost savings. To answer your first question, I think it can be read, their arguments can be read to say that. I don't know that they're quite that articulate with it. Well, that's certainly what I understood from reading this. It could be that just they like the firefighters so much they want to give them all $1,000, and it's not connected in any way with trying to sweeten the pot of the collective bargaining here, but I suspect they thought that this was probably to try to sweeten the pot so that it wouldn't be just imposing this new rule upon the firefighters. Isn't that what's going on? Right, but they also, the whole point of their argument is that they said these firefighters already have it too good. They already have it too good, and so the rationale is we're going to get these guys. Well, I suspect the fact that you are here presenting the argument on behalf of the firefighters that what happened here is wrong, they're less likely to be happy with this change in the policy if there was no money coming. Wouldn't that be the case? I mean, if the city offered them nothing but change the sick leave policy, I don't think they're going to be any happier about this. So, you know, the whole business of collective bargaining with public employees is somewhat problematic, but I guess what they tried to do is show good faith, or at least some things. Well, here's $1,000. That should ease the pain of the new rule. Wasn't that what they're trying to do? It was, but they're also crying poor at the same time. What would you suggest they do? I mean, they're trying to show good faith. They're trying to engage in bid pro quo, as they talk about. I don't understand. Are you saying that you somehow have the right to approve of what they're trying to do to facilitate an agreement? Well, I mean, the idea that you give away money while claiming you're poor is what we take issue with. But collective bargaining is not limited to the issue of money. They can offer time off. They can offer all sorts of other things. Increase in personal days. Other sorts of situations that aren't payment of money. But to offer money, it would be like somebody showing up and asking for a public defender. But is it a basis to attack the decision? I don't think that's a basis. I mean, you can attack it on that basis, but is that a legal basis to say that the decision is not appropriate? I think it is. I think it doesn't make sense. Well, we know sometimes it doesn't make sense in the law. Right. I think it's part of the second and third cicero factors. I don't think it goes through the arbitrator's authority, but I think it's one of those things that undercuts the logic. Maybe not in and of itself. And I have another question. Sure. In your brief and arguing today, you're saying this didn't address what the arbitrator said he was trying to address. Correct. Tell us what you believe he was trying to address. Well, as he said on page 13, he thought he needed to do something about the pension shortfall. He was moved by that. He was compelled to do something about that. His award from pages 12 through 19 talks almost exclusively about this pension problem. But nothing in his award does anything to fix it. Okay. Today on page 19 of his decision, which is the last page, it's A21 in the appendix, the next to last sentence before the award, we have the following language. The interest in the welfare of the public are served by this change because it is better to now start reining in some of the city's So I'm not so sure that I agree that he was necessarily trying to address something right now. I think he was saying the city has provided this information regarding what the future may look like. It's speculation. It's not definite. And so it's appropriate now to put something in place that may be able to impact that and prevent that having such a damaging effect. Is that wrong? If that's what he's saying, again, I don't read that, and to me that's inconsistent with everything else he was talking about. He keeps coming back to this pension issue as if he believed that there's some relationship between sick leave and pension, that he could do something about the sick leave, and that would forestall the doom of this $37,600,000 pension. I mean, when he says it's better to start now reining in some of the city's costs, it literally will be the difference between one person gets it and one person doesn't in 20 to 25 years. So it's doing something now as opposed to not doing something then and then making the change. There's no difference. There's absolutely no difference under this award. It has the same effect. Whenever this magic date is that there's a post-2013 hiree who doesn't get it, he or she will be the first person after the last person who did. So it doesn't do anything now, and it really doesn't change anything then. If that's a drastic step then, it doesn't accomplish anything. Finally, under Section 14K, the plain language of Section 14K provides for an interest to be paid whenever a retroactive award of money is affirmed. That happened. We understand that it's somewhat backwards in this situation, but the statute doesn't say that you have to be the winning party to get the statutory interest. Is this a retroactive award? It is under the standard used by the First District. The money goes to those employed prior to June 1st of 2013. So you use the date of that employment as the cutoff. Or eligibility. Correct. So it's a date retroactive, and it's definitely an award of money. So that's a retroactive award of money under the statute. An interest should attach. I guess I look at it a little bit differently. I mean, let's take Social Security benefits, and someone is applying for those benefits, and they say, you know, I was diagnosed with whatever by my doctor on such and such date, and so retroactive to that date, I have been in the position required to be in as far as having the mental illness or whatever it is to qualify for this. Isn't this a little bit different where here you have a situation basically that back date only relates to the fact that you had to be employed at that time. It doesn't necessarily relate to you attaining that status at that time. I agree with you, but I don't know what else. I don't know how else it would be described other than a retroactive date. It is a date retroactive to the award and to the trial court's decision, and there's an award of money attached to it. Thank you. Thank you, counsel. May it please the Court. The union's entire argument rises and falls on the mistaken interpretation of arbitrator Greco's interest arbitration award and their belief that he intended to somehow solve the inherent funding deficit of the pension fund itself. Once that interpretation falls by the wayside, the union's entire argument falls. Without belaboring the point and without repeating all the arguments that we've included in our briefs and what you've heard here, simply looking at the context of this interest arbitration proceeding and looking at how the award was crafted demonstrates that the arbitrator was under no misapprehension that he was going to immediately solve any inherent funding deficit right away. You begin with looking at the party's proposals. They were clearly sick leave buyback proposals. Anyone who reads those proposals would glean that they were not involving the pension fund. When you look at the evidence that was presented at the hearing to the interest arbitrator, especially the city's witness, its budget director, he was discussing almost exclusively the city's pension obligations per Illinois statute. He was referencing the pension fund as the cause for what was going to make the city have to pay a lot more money in the future. We were not presenting arguments or evidence suggesting that the pension fund itself should be cured by the interest arbitrator. When you look at the party's post-hearing briefs to the interest arbitrator, there was no suggestion by any parties that the interest arbitrator had to solve the pension fund deficit all by himself. Well, despite the lack of argument or perhaps the lack of focus on that, it almost appears as if the arbitrator is engaging in establishing public policy. And the arbitrator himself says, this turns upon how much weight, if any, should be given to the city's projection that it faces this shortfall in pension liabilities. I mean, he's saying the case turns on that. And he's thinking, and he's relying on that, Your Honor, based on statutory factors that require him to consider the interests and the welfare of the public. Except that the words that he uses make it seem as if that has become a primary factor in his thinking, and that he's going to be a white knight that helps the city of Bloomington. When you read his award in the context of the evidence that was presented, we believe and we think a fair interpretation of the award was simply that he was using the reference to pension shortfall, pension liability, 37.6 million, as simple shorthand. No different than, let's say, our politicians, our commentators in the media will sometimes refer to the state pension crisis as just in shorthand, the pension crisis. Yeah, but when we make decisions or when arbitrators make decisions, I hope we're not speaking and talking like the people out there that want votes or want certain public policies. We're supposed to be basing it on the issue before us. And I understand that that's a factor. That can be a factor. It's the ability to meet any obligation, not the ability to meet a pension obligation. Right? I mean, the factor is how can the city meet its obligations? It's funding obligations, right. But all funding obligations. True. This could have been in a different context. The city could have been arguing that it had some municipal bonds that were going to come due in 20 or 30 years. If we don't pay these dollars, they're going to close this booth. Right. So can you take that into account? Absolutely. That would fall under the factor of the public interest in welfare. If the evidence at the hearing would be persuasive enough to convince the arbitrator that it is in the public interest to free up money in one area, legacy costs, in this case sick leave buyback, to free up that money to spend in other very important areas that are important to the general public or to employees. Yes, that is a legitimate thing. Would the city have to promise to do that? Excuse me? Would the city have to promise to do that? We don't think that that's actually one of the elements under this section 14. So the arbitrator is doing what he's doing for the greater good, but we don't have any reasonable expectation that the city will pay any attention to that. Because throughout the state, local governments, municipalities, and those guys across the street aren't keeping any promises. With all due respect, if you take that to its logical extreme, if there was some sort of requirement or some sort of condition placed on it saying, I'm going to grant you your proposal, but the condition is that you have to use that money, if you take that to its logical extreme, no employer then would ever be able to eliminate or to modify legacy costs because of the cost, what it might entail in the future. Because there's always unexpected things that might arise. There might be a change in the statute. But isn't this arbitrator hoping that they will do that? I think he was convinced by the city's arguments and the evidence, unrebutted evidence, that we were going to be having these pension funding liabilities 15 to 20 years out, and that it was time now to start helping save some money and free up some money to address those pension costs. He might pull the city council and say, yeah, that's a real problem, but right now we've only got enough money, we'll save enough money from this to fix some of the potholes. Which does nothing to the unfunded pension. There's a myriad of unknowns and variables that could happen in 20 to 30 years, but that doesn't necessarily take away from the rationality, which is the standard here for the interest arbitrator's award. Is it rational for him to accept that argument and to allocate and to grant the city's proposal? If those things are unknown, how is it rational for him to rely upon them? It's rational because it makes sense that the city may then take that cost savings and allocate it to other more pressing needs in the future. It's rational to believe that. It's rational to understand that. Meaning that it's not beyond the realm of possibility that it will happen. And we would say that we have a commitment, that's why the city has been seeking to modify all its legacy costs. As we summarized in our appellate brief, this has been a priority with its other collective bargaining units. We have achieved, through voluntary bargaining, to have a lot of the unions actually reduce its legacy costs. Fire union was not agreeable to ask for too much interest arbitration. Police union gave us another trade-off in another area that satisfied our legacy costs. Does that matter? How is that relevant? It's relevant in response to your point about what is the guarantee or what is the evidence that suggests that the city is serious about this. I think when you look at the history of bargaining... I don't mean to suggest they're not serious about saving money. I'm saying that it is entirely speculative and I think irrational to make a determination based on what you think the city might do in the future with those dollars. We would say, though, that if you take that to its logical extreme, no city then would ever be able to eliminate any legacy costs unless some sort of condition was placed on the bargaining proposal then, which interests arbitrators really don't have to... Some cities might have different contracts and different bargaining situations. I don't think... maybe you could... I don't know. Are firefighters treated uniformly around the state of Illinois? Or police officers? Do they all have the same collective bargaining agreement with their municipalities? Oh, no. It differs from... There are certain provisions in one municipality for their firefighters and it differs from another community. Let me ask this question. Mr. Voyles seemed to be arguing that... And I think in this regard he's correct based upon the Supreme Court of Illinois' decision that the pension burden is one which can't be remedied by being reduced. It's just going to have to be met for all those people who are currently the beneficiaries of a good pension system. Did you understand that to be his argument? Well, the reason I ask that is if that's the case, then as opposed to other expenses the city might face in the future and whether or not they meet them, this is an expense that they can't get around. Seemingly no matter what. Well, the reason and the basis of what our budget director testified is that this obligation has been imposed on it by the General Assembly. There are now very strict benchmark dates and benchmark funding contribution rates that the city is going to have to meet in the next 15 or 20 years. There is no way to get around it. That is what is causing this crisis in terms of funding. Not the pension deficit itself, but the funding. In answer to your question, there is no way to get around that statutory obligation that the city will have to be faced with. So they will have to come up with the money someplace. As opposed to the state, and I'm not even sure how the state works, but I guess the city if they don't pay would be subject to being forced to pay in litigation, would they not? It would be forced to pay, and I'm not a pension expert, but I believe the statute in question that imposes these additional obligations have certain enforcement mechanisms which involve the state controller, and there are certain ways for them to actually take the money from the city, either by reducing grants or reducing other types of state contributions. So there are mechanisms in place. From the arbitrator's point of view, this is not an optional expense that the city faces 20 years down the road or whatever. This is a certain expense the city faces. Well, and forgive me if I was misunderstanding what Justice Knecht was saying, but yes, absolutely, it's not optional. It's something that we have to pay. It's not the zoo that they could close. From what pot of money we take, from what pot we take the money from, I thought that was what we were discussing. Well, to be specific, they could close the zoo or not fill the potholes, and the citizens might not like it, but if they don't pay their pensions, they're going to be dragged into court and the city forced to pay. That is true. We would agree with that. Yes. Yes. Just a few other comments. In the post-hearing brief or in the appellate briefs, the union had mentioned and was sort of questioning the $100,000, and they had mentioned it today about the quid pro quo and if the city is truly suffering a financial crisis, why did it offer $100,000? I would like to just address that to the court. Under interest arbitration principles, most interest arbitrators will say the party that's seeking to achieve a breakthrough in collective bargaining, is seeking to make a significant change in a contract provision, not only has to show the need for the change, but actually, as part of collective bargaining, has to extend and offer something financial or something else of value to the union. The city was taking the position that, listen, we don't think we need to offer a quid pro quo here, but Mr. Arbitrator, if you think that we do owe the union one to be safe, we will offer them $1,000 per employee now in terms of offsetting the burden that we'll have on the collective bargaining unit in the future. That is the theory behind why the city offered the $1,000 per firefighter, approximately 96, 97 firefighters, that's where the $100,000 comes out. One time... It wasn't just because they like them? It wasn't because they like them. No, it was to hedge our bets in hope in case the interest arbitrator demanded that actual quid pro quo. One time cost, according to the budget director's calculations, which were not rebutted and very lightly cross-examined during the interest arbitration hearing, according to the budget director's estimated costs for firefighter sick leave buyback, the city will more than reap and more than compensate for that $100,000 20 to 30 years in the future as more and more firefighters retire with a reduced sick leave buyback. The quotes and the estimates we were making in our brief was based on a hypothetical of 10 firefighters retiring after 20 years of service with 50% of what they would have been retiring with now. For every additional firefighter that retires, that will be that much more. The other key factor is our estimate was based on current dollars. Assuming that their wages and the cost of sick leave never ever increase for the next 20 to 30 years. We actually put a calculation in our brief that suggests that assuming even a modest wage increase over the next 20 or 30 years, that overall cost or that cost savings to the city is going to be in the millions of dollars by the time we get to the 2030s, which is that important time period where we're going to be facing that 2040 benchmark, the fully funded benchmark day where we're going to have to be contributing more and more money into the fund. So again, we believe that it was perfectly rational and reasonable for the arbitrator to look at that $100,000 and think to himself, the cost savings are going to more than outweigh that $100,000. Let me ask you a question. Yes. You're the arbitrator. Forget the $1,000, going back to the primary issue. Would you have written a decision in the same way? Would you have used the language that he used? I will say this. One could say, he could have alternatively, I don't think he had to do this, but he could have alternatively used the mouthful of language to say something, I hereby find significant the city's financial pension funding contribution obligations that it will have to face in 15 to 20 years that are being caused by the inherent funding deficit. I think he could have used language like that. I don't mean that kind of language. I mean just say, or not say, this case turns on the weight to be given to the underfunded pension. Well, I leave some of that stuff out. I don't think that's the standard for, could he have? He certainly could have. I don't think that's... I'm asking what you would have done. Would you have put that in there other than saying, it's permissible for me to consider the city's financial situation? Honestly, if you want to know, I would have probably played up more of the Section 14H factors, which the arbitrator did do, don't get me wrong, but that is the key. I believe what the arbitrator was doing was he was bootstrapping and trying to explain why the interest in the welfare of the public factor weighed in the city's favor, and he was describing why he thought that. Could he have or would I have maybe focused more on the actual statutory language? I might, if put into that situation. But I believe that's what he was essentially doing. And from a, in light of the deferential standard that the court is required to give to this arbitrator and the arbitrator's language, if there's any possible, I believe that's the Supreme Court standard in Rao v. Rockford Products Court, if there is any possible way to construe the validity of this award, you're supposed to interpret it in that way. We believe that we presented, first of all, we disagree with the union's interpretation, but even if you assume that there is some ambiguity in the word, it can be construed in a way that upholds its validity. And we would rest with that. Thank you. Thank you. Herbal? Twice during their arguments, the city suggested that the city is going to have to contribute more in the next 15, 20 years towards pensions. I think it was brought up by the court that, well, maybe in 20 years they're going to have more pension obligations. That's a complete misunderstanding of the situation. The statute says by fiscal year 2016, which has already begun. Basically fiscal year, you know, starts in 2015. Fiscal year 2016 would have started in 2015. The city has to contribute money now to keep this $37,600,000 pension issue from happening. This award doesn't do that. It doesn't do anything. The only thing it does is in some future date it turns the switch off and what was the benefit before is a different benefit. And then at that time, in 20 years, after all of these pension contributions should have been made to keep that pension deficit from happening, then at that time it may, it could, it might generate some savings. So this award does not do what the arbitrator said it would do. We think this was an award that was directed at pension funding, which is beyond the scope of the arbitrator's authority. And we think his approach to it, what he thought it was doing, is irrational and fails also under the second and third test of Cicero. Thank you. Thank you. We'll take this matter under advisement and await the readiness of the next case.